UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FORMFACTOR, INC.,

        Plaintiff,

    v.

MICRO-PROBE, INC., et al.,

        Defendants.

_____/

No. C 10-3095 PJH

**ORDER RE CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

      The parties' cross-motions for summary judgment came on for hearing before this
court on May 9, 2012.  Plaintiff FormFactor, Inc. appeared by its counsel William J.
Robinson; defendant Micro-Probe, Inc. appeared by its counsel Richard I. Yankwich and
Rajiv Dharnidharka; and defendant David Browne appeared by his counsel Deborah Sirias.
Having read the parties papers and carefully considered their arguments and the relevant
legal authority, and good cause appearing, the court hereby GRANTS defendants' motion
and DENIES plaintiff's motion.

**BACKGROUND**

      This is a case alleging patent infringement and state law claims of trade secret
misappropriation and breach of confidence.  Plaintiff FormFactor, Inc. ("FormFactor")
designs, manufactures, sells, and supports high-performance "advanced wafer probe card
assemblies," which are used to test semiconductor wafers before the wafers are cut up
onto individual "chips."

      Wafer probe card products can be one of three types – DRAM (dynamic random
access memory), SoC (system on a chip) non-memory, or Flash memory.  FormFactor's
business is primarily focused on DRAM, with 70% of its revenue derived from DRAM-

United States District Court

For the Northern District of California

1   related products.  FormFactor also has significant business in Flash memory products

2   (approximately 15% of its revenue).  A number of companies compete in the market for

3   wafer probe card products.  For example, defendant Micro-Probe Incorporated ("Micro-

4   Probe") also develops, manufactures, and supports wafer probe card products.  However,

5   Micro-Probe's business is focused solely on the non-memory SoC market.

6        In the present action, FormFactor asserts that Micro-Probe has been hiring current

7   and former FormFactor employees, including engineers and marketing executives, for the

8   express purpose of having them disclose FormFactor's confidential technical and marketing

9   information.  Among the former FormFactor employees hired by Micro-Probe is defendant

10  David Browne ("Browne").

11       Browne joined FormFactor in 2000, eventually becoming Vice President of DRAM

12  Business Management.  From 2000 until 2004, Browne managed FormFactor's account for

13  Intel.  In 2004, FormFactor hired another employee, Timothy Lillie, to manage that account.

14  Mr. Lillie testified that starting around the end of 2004, he was solely responsible for

15  managing the Intel account at FormFactor, and that Browne no longer worked on it.

16       During the time he was employed at FormFactor, it was Browne's practice to work at

17  times from his home, particularly when necessary to conduct business late at night (local

18  time) with FormFactor's contacts in Asia.  Colleen Cremarius, a Human Resources

19  Business Partner at FormFactor, testified in her deposition that she was not aware that

20  Browne had a home office, but that FormFactor did not have a policy that either allowed or

21  precluded employees from working at home.  She stated that "[i]t's usually something that's

22  worked out with their manager if they chose to work during the day during working hours[,]"

23  and that "[i]f they chose to do that evening or early morning, they do that because it's part

24  of their job responsibility."

25       Browne testified that FormFactor provided him with home office equipment, including

26  a home docking station, a laptop computer, an external hard drive, and thumb drives.  He

27  also had full remote access to FormFactor's server and to his FormFactor e-mail account

28  through a VPN (private network) connection.  Browne testified that FormFactor allowed him

1  to use his personal e-mail account and personal home computer to complete tasks relating

2  to FormFactor's business, particularly when he was unable to log into the FormFactor

3  system.  It was Browne's usual practice to periodically back up all his FormFactor files on

4  external drives.  He testified that during his employment at FormFactor, he was permitted

5  to access and copy all the files found on his FormFactor laptop and external hard drive.

6  Ms. Cremerius testified that if a FormFactor employee was doing FormFactor work

7  from home, the employee could log onto FormFactor's data through the VPN on his/her

8  own personal computer.  She was unaware of any policy prior to the date of Browne's

9  resignation from FormFactor that required employees to delete anything from their personal

10  computers which might have been there because they worked at home through the

11  FormFactor VPN.  She was also unaware of any policy that precluded employees from

12  backing up FormFactor data onto thumb drives, although she did not know whether

13  FormFactor provided employees with thumb drives.

14  Finally, Ms. Cremerius testified that she was unaware of any policy that required

15  FormFactor employees to advise FormFactor if/when they began searching for employment

16  with another company, or that required employees who were considering leaving

17  FormFactor to stop accessing the FormFactor computer system or to stop working from

18  home or backing up data.

19  At some point in the fall of 2009, Browne began communicating with Micro-Probe

20  regarding the possibility of employment at that company.  The last time Browne backed up

21  FormFactor files on his hard drive was on January 1, 2010, which was during the period

22  that he was negotiating with Micro-Probe regarding employment.  According to FormFactor,

23  many of the files that Browne copied on January 1, 2010 contained trade secrets that are at

24  issue in this case.

25  On February 10, 2010, Micro-Probe made Brown a written offer of employment, to

26  commence on March 8, 2010.  Browne provided written acceptance of the offer on

27  February 12, 2010.  The written acceptance also included an agreement that he would not

28  use his former employer's proprietary or confidential information.  That same day, Browne

**United States District Court**
For the Northern District of California

1   gave notice of his resignation to his manager at FormFactor, and, following an exit

2   interview lasting approximately 15 to 20 minutes, was escorted off the premises.  He was

3   not allowed to take any materials, even his personal belongings (which were later mailed to

4   him).  He turned over his laptop computer and security badge.

5        Ms. Cremerius testified that the exit interview was conducted that same day because

6   Browne was leaving to work with a competitor.  She testified that Browne's personnel file

7   did not contain an Employment Confidentiality and Invention Assignment Agreement, or

8   any non-disclosure or non-solicitation agreement, and that she was not aware of his having

9   ever signed any such agreements.  (Browne himself testified that he did not recall ever

10  having signed an agreement not to use confidential information while at FormFactor, or

11  having signed a non-disclosure or non-solicitation agreement.)

12       Ms. Cremerius further testified that Browne was not asked during the exit interview

13  whether he possessed any FormFactor materials at his home, or whether there were any

14  such materials on any devices at his home, and that she did not discuss confidential

15  information with Browne during the exit interview.  Indeed, there is no evidence that anyone

16  at FormFactor inquired about the status of the FormFactor files on Browne's home

17  computer system, or requested that he return any such materials at the time he was

18  leaving the company.  Two weeks after Browne left FormFactor, the company sent him a

19  letter reminding him of his obligation not to use FormFactor's confidential information at

20  Micro-Probe.  The letter did not inquire about any materials Browne might have at his home

21  office.

22       On March 8, 2010, Browne commenced his employment at Micro-Probe, as Vice-

23  President of Sales and Business Development for SoC.  FormFactor claims that Browne

24  was hired for "what he knew," and that he conspired with Micro-Probe to steal FormFactor's

25  confidential and proprietary information while he was employed at FormFactor, and that he

26  took that information with him when he moved to Micro-Probe.

27       On March 30, 2010, approximately six weeks after Browne left FormFactor and three

28  weeks after he started his new job at Micro-Probe, he received a letter from outside

4

United States District Court

For the Northern District of California

1   counsel for FormFactor, inquiring about the status of the FormFactor files at his home.  At

2   that time, he was not represented by counsel.  He attempted to delete the FormFactor files

3   he had previously downloaded, and which remained on his home computer.  He then

4   retained counsel, and his counsel took the data storage devices with him.

5       Both Micro-Probe and FormFactor hired computer forensics examiners to image the

6   drives. On May 12, 2010, counsel provided the home computer, external hard drive, and

7   thumb drives to FormFactor's independent forensic analyst for imaging.  Browne's counsel

8   subsequently turned over all the FormFactor data storage devices previously in Browne's

9   possession to another forensic computer consultant, James Vaughan, for forensic imaging.

10  After FormFactor served its March 23, 2012 trade secret List, Vaughan compared the file

11  names on the List with the file names on the data storage devices, and established that

12  Browne had never emailed any file on the List to anyone at Micro-Probe, and that no

13  document on the current List resides on any Micro-Probe server or data storage device.

14      The only exception is a "scorecard" – a generic type of spreadsheet that many

15  companies in the semiconductor industry use to "score" competitors – that appears on a

16  FormFactor thumbdrive was brought to Micro-Probe by Browne.  The concept of using a

17  scorecard did not originate at FormFactor, and there is no evidence that Browne learned to

18  use scorecards at FormFactor or indeed that he had used scorecards in his previous

19  employment.  The particular scorecard at issue was a template DRAM summary of probe

20  card industry companies as of 2008.  However, there is no evidence that Micro-Probe has

21  ever used the scorecard, or that it even contained any information that could have assisted

22  Micro-Probe, much less that any use caused damage to FormFactor.

23      The case was originally filed in July 2010.  In February 2011, FormFactor filed the

24  second amended complaint ("SAC"), alleging ten causes of action – seven claims for patent

25  infringement asserted against Micro-Probe; and state law claims for trade secret

26  misappropriation and conspiracy to misappropriate trade secrets, against Micro-Probe and

27  Browne; breach of confidence, against Browne, and conspiracy to breach confidence,

28  against Micro-Probe and Browne; and unfair competition under California Business &

United States District Court

For the Northern District of California

1    Professions Code § 17200, against Micro-Probe.

2         On April 28, 2011, the court bifurcated the patent claims and the state law claims.

3    The state law claims are to be resolved in Phase 1 of the case, and the patent claims are to

4    be resolved in Phase 2.  Each side now seeks summary judgment as to the three state-law

5    claims.

6                                        **DISCUSSION**

7    A.    Legal Standard

8         A party may move for summary judgment on a "claim or defense" or "part of . . . a

9    claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

10   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

11   matter of law.  Id.

12        A party seeking summary judgment bears the initial burden of informing the court of

13   the basis for its motion, and of identifying those portions of the pleadings and discovery

14   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

15   v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

16   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

17   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

18   verdict for the nonmoving party.  Id.

19        Where the moving party will have the burden of proof at trial, it must affirmatively

20   demonstrate that no reasonable trier of fact could find other than for the moving party.

21   Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

22   the nonmoving party will bear the burden of proof at trial, the moving party may carry its

23   initial burden of production by submitting admissible "evidence negating an essential

24   element of the nonmoving party's case," or by showing, "after suitable discovery," that the

25   "nonmoving party does not have enough evidence of an essential element of its claim or

26   defense to carry its ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co.,

27   Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S.

28   at 324-25 (moving party can prevail merely by pointing out to the district court that there is

                                            6

United States District Court
For the Northern District of California

1    an absence of evidence to support the nonmoving party's case).

2        When the moving party has carried its burden, the nonmoving party must respond

3    with specific facts, supported by admissible evidence, showing a genuine issue for trial.

4    Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence of

5    only "some alleged factual dispute between the parties will not defeat an otherwise properly

6    supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

7        When deciding a summary judgment motion, a court must view the evidence in the

8    light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

9    Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).  In adjudicating

10   cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion

11   separately, giving the nonmoving party in each instance the benefit of all reasonable

12   inferences." ACLU of Nevada v. City of Las Vegas, 466 F.3d 784, 790-91 (9th Cir. 2006)

13   (citations omitted).

14   B.    The Parties' Motions

15        1.    Trade secret misappropriation

16        A plaintiff asserting a trade secret misappropriation claim under the California

17   Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426.1, et seq., bears the burden

18   of proving each element of the claim as to each claimed trade secret.  See O2 Micro Int'l

19   Ltd. v. Monolithic Power Sys., Inc., 399 F.Supp. 2d 1064, 1072-75 (N.D. Cal. 2005).  To

20   prevail on a misappropriation claim under the CUTSA, the plaintiff must establish that it

21   owns a clearly identified trade secret; that the defendant acquired, disclosed, or used the

22   plaintiff's trade secret through improper means; and that the misappropriation caused

23   damage to the plaintiff.  Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665

24   (2003), cited in KLA-Tencor Corp. v. Murphy, 717 F.Supp. 2d 895, 906 (N.D. Cal. 2010).

25        FormFactor contends that it has provided evidence sufficient to establish the

26   existence of trade secrets and the fact of misappropriation, and that the court can

27   summarily adjudicate those "issues" without reaching the elements of causation and

28   damages.  Defendants assert that FormFactor has failed to provide evidence sufficient to

1    establish any element of the claim of trade secret misappropriation.

2              a.      Existence of trade secrets

3         Under the CUTSA, a "trade secret" is defined as "information, including a formula,

4    pattern, compilation, program, device, method, technique, or process" that "[d]erives

5    independent economic value, actual or potential, from not being generally known to the

6    public or to other persons who can obtain economic value from its disclosure or use."  Cal.

7    Civ. Code § 3426.1(d).

8         FormFactor argues that its trade secrets – which it claims consist of all the

9    FormFactor files or documents that Browne downloaded or backed up on his computer

10   while employed at FormFactor – meet the requirements of the CUTSA, in that they are

11   "information" and have independent "economic value," and were the subject of reasonable

12   efforts to maintain their secrecy.  Defendants assert, however, that FormFactor has failed

13   to identify its trade secrets with sufficient particularity, and has not shown that the alleged

14   trade secrets derive independent economic value from not being generally known to the

15   public, or that they are the subject of reasonable efforts to maintain their secrecy.

16        A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade

17   secrets and carry the burden of showing that they exist."  MAI Sys. Corp. v. Peak

18   Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993); see also Agency Solutions.com, LLC v.

19   The TriZetto Group, Inc., 819 F.Supp. 2d 1001, 1015 (E.D. Cal. 2011) (to identify the trade

20   secret with particularity, the plaintiff must first "clearly identify what the 'thing' is that is

21   alleged to be a trade secret," and second, must "be able to clearly articulate why that 'thing'

22   belongs in the legal category of trade secret").  During the course of the litigation, the trade

23   secrets that form the basis of a claim of misappropriation must be identified "with sufficient

24   particularity to separate [the alleged trade secrets] from matters of general knowledge in

25   the trade or of special knowledge of those persons . . . skilled in the trade."  Imax Corp. v.

26   Cinema Techs., Inc., 152 F.3d 1161, 1164-65 (9th Cir. 1998); see also Cal. Civ. P. Code

27   § 2019(d) (a party alleging misappropriation of trade secrets "shall identify the trade secrets

28   with reasonable particularity").

United States District Court
For the Northern District of California

8

United States District Court

For the Northern District of California

1    FormFactor initially provided defendants with a 635-page list of alleged trade secrets

2    (including more than 13,000 files) in spreadsheet format, on October 20, 2010.  According

3    to defendants, this list included every file ever placed on Browne's home office external

4    hard drive – FormFactor documents, photographs of Browne's family, Browne's music files,

5    and various industry publications.  FormFactor subsequently provided defendants with a

6    narrower list, which included more than 6,100 separate files or documents.  Most recently,

7    on March 23, 2012, after being ordered to do so by the court, FormFactor provided a

8    further revised 499-page list of trade secrets ("the List") in spreadsheet format, which

9    included approximately 4,500 files.

10    None of these lists sufficiently identifies the trade secrets with particularity, in part

11    because of the very size of the lists, and in part because many of the entries consist of a

12    mere listing of names of computer files.  Even Benjamin Eldridge, FormFactor's Chief

13    Technology Officer and Rule 30(b)(6) corporate designee, was unable in his deposition to

14    explain from looking at various entries on the List exactly what trade secret was being

15    claimed.  Rather, he testified that for any entry on the List, he would need to look at the

16    underlying document in order to be able to explain what the trade secret information was.

17    Moreover, at the hearing on the present motions, the court attempted to elicit from

18    FormFactor's counsel a description of any specific trade secret derived from the List, but

19    was unsuccessful.  See May 9, 2012 Hearing Transcript ("Tr.") at 24-27.

20    FormFactor's position, as presented by the argument of counsel at the hearing, is

21    that a plaintiff alleging trade secret misappropriation can satisfy its burden of identifying the

22    trade secrets at issue with particularity by providing a lengthy list of file names or items and

23    a declaration by a representative of the plaintiff certifying that all items on the lengthy list

24    are intended by the plaintiff to be confidential.  At that point, it becomes the court's task "to

25    make a determination as to whether a given piece of confidential information constitutes a

26    trade secret."  Tr. at 5.  Then, if the court decides that the confidential information included

27    on the lengthy list "constitutes a trade secret, . . .the sole remedy is the Uniform Trade

28    Secret[s] Act."  Id.  If, however, "the matter does not qualify as a trade secret, you can

recover for theft under various common law theories." Id.  Put another way, "[e]ither it is a trade secret and we get summary judgment on the trade secret claim or it's not a trade secret, it is merely confidential and we get summary judgment on the breach of confidence claim." Tr. at 7.

This proposed formulation of the standard is incomplete, however because it omits the requirement that the plaintiff identify each particular trade secret (not just a file that might contain a trade secret), and the requirement that the plaintiff describe the subject matter of the trade secret "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." Imax, 152 F.3d at 1165; see also Agency Solutions.Com, 819 F.Supp. 2d at 1017-18. Here, neither the List nor the testimony of FormFactor's witnesses provides the requisite showing to clearly identify what each individual thing is that is alleged to be a trade secret.

Nor has FormFactor established that any specific trade secret has independent economic value.  To establish independent value, a plaintiff must show that the trade secret is "sufficiently valuable and secret to afford an actual or potential economic advantage over others" who do not possess the information.  Yield Dynamics, Inc. v. TEA Sys. Corp., 154 Cal. App. 4th 547, 564 (2007); see also Religious Tech. Center v. Netcom On-line Commc'n Servs., Inc., 923 F.Supp. 1231, 1252-53 (N.D. Cal. 1995).

Here, FormFactor provides evidence of the amount it spends on research and development ("R&D"), arguing that because it spends $50 million a year on R&D ($300 million since the inception of the company), its trade secrets necessarily have independent economic value.  However, FormFactor has not established that there is any connection between the value of the alleged trade secrets at issue (the files deleted from Browne's hard drive) and the R&D spending.  Nor can FormFactor establish independent economic value of the "scorecard" (the only alleged trade secret that Micro-Probe has been shown to have possessed), because FormFactor has not shown that this "scorecard" format is not in the public domain.

Finally, FormFactor has not established that its alleged trade secrets have not been

10

United States District Court

For the Northern District of California

1    publicly disclosed, and cannot do so.  Public disclosure is "fatal to the existence of a trade

2    secret." Apple, Inc. v. Psystar Corp., 2012 WL 10852 at *1 (N.D. Cal. Jan. 3, 2012).  That

3    is, "information that is public knowledge or that is generally known in an industry cannot be

4    a trade secret." Ruckeshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984).  For example,

5    information that is available to the public in the form of publications does not qualify for

6    trade secret protection.  See Computer Economics, Inc. v. Gartner Group, Inc., 1999 WL

7    33178020 at *6 (S.D. Cal. Dec. 14, 1999).

8          Information is protectable as a trade secret where the owner has made "reasonable

9    efforts under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d)(2).

10   "Reasonable efforts" may include advising employees of the existence of a trade secret,

11   limiting access to the trade secrets on a "need to know basis," requiring employees to sign

12   confidentiality agreements, and keeping secret documents sequestered under lock and

13   key.  See Art of Living Foundation v. Does, 2012 WL 1565281 at *21 (N.D. Cal. May 1,

14   2012) (citing cases); see also SkinMedica, Inc. v. Histogen Inc., 2012 WL 1409560 at *12

15   (S.D. Cal. Apr. 23, 2012).

16         Here, there is no evidence that FormFactor made reasonable efforts to protect the

17   secrecy of any particular trade secret.  As for any trade secrets disclosed to Browne, the

18   evidence shows that FormFactor did not enter into a written agreement with Browne to

19   protect its trade secrets, that it allowed him to retain his contact information when he left

20   FormFactor, that it allowed/authorized Browne and other employees to work from home

21   (including using personal email to conduct FormFactor business, and to back up

22   FormFactor data onto external hard drives), and that it did not request that Browne return

23   any FormFactor data when he tendered his resignation and left the company.

24         As for FormFactor's efforts to protect its trade secrets generally, while FormFactor's

25   Rule 30(b)(6) witness, Mr. Eldridge, testified that "[p]retty much everything we do [at

26   FormFactor] is marked "Confidential[;]" that all items marked "Confidential" at FormFactor

27   are considered to be trade secrets; and that FormFactor employees are told that materials

28   marked "Confidential" are to be considered trade secrets, he also testified that he did not

1    know whether particular items on the List that were marked "Confidential" had ever been

2    disclosed or placed in the public domain.

3        Moreover, notwithstanding that the discovery magistrate ordered FormFactor to

4    conduct an internal investigation to determine which of its listed trade secrets had never

5    been disclosed publicly, and to be prepared to testify about public disclosure for each listed

6    trade secret at the court-ordered Rule 30(b)(6) deposition, Mr. Eldridge testified in

7    response to inquiries regarding numerous entries in the List that he had in fact not

8    conducted such an internal investigation.  Nor was he able to provide a specific response

9    when asked how particular "Confidential" documents were maintained at FormFactor, apart

10   from stating that "I would assume it's kept on our servers[,]" which "are obviously not open

11   to the public" and that "[t]here's employee training that takes place around the handling of

12   confidential information."

13       The court discounts Mr. Eldridge's testimony in his sworn declaration submitted in

14   support of FormFactor's motion, to the extent that it contradicts his prior deposition

15   testimony.  For example, Mr. Eldridge states in his declaration that "[having looked at the

16   List and having reviewed the hundreds of documents in preparation for my deposition, it is

17   my view that the documents on the List have not been released to the public[,]" and also

18   states that the reason he testified in his deposition that he had conducted no investigation

19   to determine whether any particular document was in the public domain was because "it

20   was not necessary" for him to make an investigation in view of his "knowledge of the

21   documents on the [L]ist and the process for releasing them."

22       The general rule is that a party cannot create a genuine issue of fact by providing a

23   declaration that contradicts earlier deposition testimony.  See Van Asdale v. International

24   Game Tech., 577 F.3d 989, 998 (9th Cir. 2009) (citing Kennedy v. Allied Mut. Ins. Co., 952

25   F.2d 262, 266 (9th Cir. 1991)).  Here, Mr. Eldridge was examined at length in his deposition

26   on the subject of public disclosure, and he unambiguously and repeatedly testified that he

27   did not know whether particular documents or files on the List had been publicly disclosed,

28   and that he had not engaged in any internal investigation for the purpose of determining

United States District Court

For the Northern District of California

1   whether any particular documents had been disclosed.  Thus, Mr. Eldridge's assertion in

2   his declaration that he knew that none of the documents or files had been disclosed directly

3   contradicts his testimony at deposition that he did <u>not</u> know whether documents or files had

4   been disclosed, and to that extent, the declaration falls within the sham affidavit rule.  <u>See</u>

5   <u>Van Asdale</u>, 577 F.3d at 998.

6           b.     Misappropriation

7   The CUTSA defines "misappropriation" of a trade secret in two ways.  It is the

8   "[a]cquisition of a trade secret of another who knows or has reason to know that the trade

9   secret was acquired by improper means," which may include theft, bribery,

10  misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or

11  espionage through electronic or other means; or it is the "[d]isclosure or use of a trade

12  secret of another without express or implied consent" by a person who used improper

13  means to acquire knowledge of the trade secret, or who knew at the time of disclosure or

14  use that his knowledge of the trade secret was obtained through a person who had utilized

15  improper means to obtain it, or acquired it under circumstances giving rise to a duty to

16  maintain its secrecy, or who derived it from a person who owed a duty to the person

17  seeking relief to maintain its secrecy.  <u>See</u> Cal. Civ. Code § 3426.1(a), (b).  Here,

18  FormFactor alleges both improper acquisition of the files, and improper use of the

19  information.

20  FormFactor bases its claim primarily on the following:  (1) the fact that Browne

21  copied FormFactor files onto his home computer, particularly during the period when he

22  was negotiating with Micro-Probe regarding the possibility of employment; (2) a statement

23  by Browne in his responses to FormFactor's Requests for Admissions that he "used"

24  information at Micro-Probe that he had learned at FormFactor (among other places), and

25  testimony by Browne that his job at Micro-Probe was "the same" as his job at FormFactor;

26  and (3) statements in Micro-Probe-created documents that FormFactor was "standing in

27  the way" of Micro-Probe's success, and had to be "displaced," and that Micro-Probe's goal

28

United States District Court

For the Northern District of California

1   was to "learn as much as we can" about FormFactor and to "[a]lways win Intel."[1]

2       FormFactor claims that the only reasonable inference to be drawn from this

3   evidence is that Micro-Probe wanted FormFactor's trade secrets, and also wanted to hire

4   Browne because of his knowledge of FormFactor's business and confidential information.

5   The court finds, however, that FormFactor has not established that any trade secrets were

6   misappropriated, or, more to the point, has provided no evidence showing either improper

7   acquisition or that defendants ever used specified trade secrets or disclosed specified trade

8   secrets to anyone.

9       First, with regard to the alleged improper copying, the mere possession of trade

10  secrets does not constitute misappropriation. Wyatt Tech. Corp. v. Malvern Instruments,

11  Inc., 2009 WL 2365647 at *19 (C.D. Cal. July 29, 2009); AccuImage Diagnostics Corp. v.

12  Terarecon, Inc., 260 F.Supp. 2d 941, 951 n.5 (N.D. Cal. 2003) (citing Gibson-Homans Co.

13  v. Wall-Tite, Inc., 1992 WL 512411 (C.D. Cal. Oct. 27, 1992)).  Here, the evidence shows

14  that FormFactor provided Browne with equipment for his home office, and allowed him to

15  work from his personal computer and through his personal email account.  It is also

16  undisputed that during the time of his employment at FormFactor, Browne was allowed to

17  access, use, copy, and back up FormFactor data to an external hard drive.  As noted

18  above, Ms. Cremerius testified that there was no policy at FormFactor for or against

19  employees working from home, or for or against the backing up and downloading of

20  _____

21      [1]  The court accepts FormFactor's representations that these statements appear in the
    Micro-Probe documents, which were deposition exhibits in the case and which are attached
22  as Exhibits 15-17, and 19 to the Declaration of Gina Bibby in support of FormFactor's motion.
    Nevertheless, it was not possible for the court to locate the cited references to review them in
23  context because FormFactor failed to cite to specific pages of the exhibits, which were
    relatively lengthy.  For example, the document that supposedly contains the phrase "[a]lways
24  win Intel" is 25 pages long, and the document that supposedly states that Micro-Probe's
    business goal was to "learn as much as we can about FormFactor" is 48 pages long.  It is not
25  the court's task to "scour the record in search of a genuine issue of triable fact," Keenan v.
    Allan, 91 F.3d 1275, 1278 (9th Cir. 1996), and the court "need not examine the entire file for
26  evidence establishing a genuine issue of fact, where the evidence is not set forth in the
    opposition papers with adequate references so that it could be conveniently found." Carmen
27  v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  In addition, while
    FormFactor identifies the documents as exhibits to the Browne deposition, it does not provide
28  citations to the corroborating pages of the deposition, or any explanation as to what the
    documents are.

United States District Court

For the Northern District of California

1  FormFactor files.

2      There is no evidence that Browne and FormFactor ever entered into a written

3  employment agreement, a non-disclosure agreement, a non-compete agreement, or a non-

4  solicitation agreement.  Browne did sign an agreement while at FormFactor, providing in

5  part that after his employment had terminated, he would not "claim[ ], construe[ ], or

6  present[ ] as property" any "work product created on the job using FormFactor information

7  or property."  However, this is not, as FormFactor asserts, an agreement that Browne

8  would not retain any FormFactor documents after terminating his employment – just that he

9  would not claim ownership of such documents.  Moreover, since he was authorized to

10  download/back up files onto his personal computer, any copying of documents while he

11  was employed by FormFactor could not have been a breach of this agreement.

12      The last back-up Browne did was on January 1, 2010, at which time he was still

13  employed at FormFactor.  When he resigned, and was asked to leave the same day, no

14  one inquired regarding any backed-up files he might have on his home computer.  It was

15  not until over a month later that FormFactor's counsel contacted Browne regarding the

16  backed up files.  However, FormFactor provides no evidence showing any actual use or

17  disclosure of this downloaded material by either Browne or Micro-Probe.

18      The statement in Ms. Cremerius' later-filed declaration, that had FormFactor known

19  that Browne was downloading FormFactor data at the same time that he was negotiating

20  with Micro-Probe regarding future employment, it would not have allowed Browne to copy

21  the files, is insufficient to create a triable issue with regard to whether Browne engaged in

22  improper copying, in view of the fact that Browne's downloading of files was not

23  unauthorized, and the fact (also according to Ms. Cremerius) that employees were under

24  no obligation to advise FormFactor if/when they began searching for employment with

25  another company, or to stop accessing the FormFactor computer system or to stop working

26  from home or backing up data if they were considering leaving FormFactor.

27      As for improper use, "[e]mploying the confidential information in manufacturing,

28  production, research, or development, marketing goods that embody the trade secret, or

soliciting customers through the use of the trade secret" all constitute "use" under the

CUTSA.  Agency Solutions.Com, 819 F.Supp. 2d at 1028 (citation and quotation omitted).

FormFactor has provided no evidence showing any improper "use" by defendants of any

specific trade secret included on the List.  Nor has FormFactor shown that defendants ever

disclosed any specific trade secrets to anyone.

    Browne admitted that he brought third-party-domain materials and his Outlook

contacts list to Micro-Probe, but those materials are not on FormFactor's List of trade

secrets, and thus are not part of the claims at issue.  The only document that Browne

brought to Micro-Probe that is on Form-Factor's trade secret List is the template DRAM

summary of probe card industry companies as of 2008 (the "scorecard"), but there is no

evidence that the scorecard is a trade secret or that defendants actually used the

scorecard.

    Mr. Eldridge, FormFactor's corporate designee, testified that FormFactor had no

evidence of any actual use or disclosure other than Browne's purported admission in

response to FormFactor's interrogatories and requests for admission.  However, the

referenced interrogatory responses and responses to requests for admission indicate only

that Browne backed up or copied FormFactor files during his employment with FormFactor

(which he was authorized to do).  On the other hand, evidence (including forensic

evidence) demonstrates that Micro-Probe employees did not have access to the files listed

in FormFactor's trade secret List, and that none of those files were placed on Micro-Probe's

servers or data storage devices or transmitted through emails.

    With regard to FormFactor's assertion that improper "use" is established by

Browne's response to FormFactor's Request for Admission No. 64, the court notes that

RFA No. 64 asked Browne to admit that he had "used knowledge obtained from

FormFactor in the performance of [his] duties at Micro-Probe."  RFA No. 64 did not ask

about Browne's use of any of FormFactor's trade secrets, or even any alleged confidential

information.  It simply asked about "knowledge obtained from FormFactor," which is such a

broad and generalized subject as to be nearly meaningless.  In response, Browne admitted

United States District Court
For the Northern District of California

1  that he had "used knowledge obtained from FormFactor among others in the performance

2  of his current duties at Micro-Probe."  Because neither the question nor the response

3  referenced trade secrets, the court finds that this "admission" does not establish improper

4  use sufficient to support a claim of trade secret misappropriation.[2]

5       With regard to the claim that improper "use" is shown by Browne's testimony that his

6  job at Micro-Probe was "the same" as his job at FormFactor, the court notes, as an initial

7  matter, that while counsel for FormFactor referred during Browne's deposition to the jobs at

8  the two companies being "the same," the court has not located any such testimony by

9  Browne.  It is true that Browne agreed that many of his tasks and responsibilities (listed on

10  his resume) were the same as his tasks and responsibilities at Micro-Probe – e.g., helping

11  launch new products, implementing product strategy, helping grow market share, building a

12  team of business managers, managing a worldwide sales operation, and conducting

13  worldwide sales training.  However, there is no evidence that performing any of these tasks

14  and responsibilities, which appear to be necessary components of any sales/marketing

15  manager's job, necessarily involves the use of particular trade secrets.

16       Browne may have interacted with some of the same customers at both companies

17  regarding wafer probe card products, but the evidence shows that FormFactor is involved

18  in the market for DRAM and Flash memory products, while Micro-Probe's involvement is

19  limited to the market for SoC products.  More to the point, the evidence shows that

20  FormFactor employed Browne as VP of DRAM business management, not SoC, and not

21  for the entire probe card market, whereas at Micro-Probe, he is responsible for SoC sales,

22  a different job for a different market, and involving marketing to different customers than the

23  ones Browne marketed to when he  worked at FormFactor.

24  ────────────

25       [2] FormFactor also asserts that when Browne was asked in his deposition whether he
   had ever used any confidential information he learned at FormFactor to help bring in Intel or
26  any other customer at Micro-Probe, he responded, "I don't recall," and then indicated in
   response to follow-up questions that he "could have."  However, FormFactor failed to provide
27  a citation to the relevant portions of the deposition transcript, and the court is not required to
   review the 281 pages of the transcript in order to locate this testimony.  And in any event, even
28  if accurately quoted, the testimony does not establish that defendants misappropriated
   FormFactor's trade secrets.

1    FormFactor also claims that Micro-Probe somehow persuaded Intel to shift its

2 business away from Micro-Probe, using the confidential information or trade secrets it had

3 obtained from FormFactor through Browne.  However, the evidence shows that FormFactor

4 hired another employee in 2004 to take over all Intel responsibilities from Browne, and that

5 Browne was not the Intel sales manager after about 2005.  In addition, the evidence also

6 shows that Micro-Probe began winning (and FormFactor began losing) Intel business in

7 2007, well before Browne's move to Micro-Probe.  In 2008, Intel made a large investment in

8 Micro-Probe's parent company and owns 25% of the undiluted stock.  Also in 2008,

9 FormFactor's annual revenue dropped 55% and it began conducting layoffs and executive

10 changes.  In addition, Browne has no direct role at Micro-Probe with respect to Intel

11 business and the products he <u>sells</u> at Micro-Probe are different from those he <u>marketed</u> at

12 FormFactor.

13    Thus, even if some tasks and responsibilities are "the same," and Browne "solicits"

14 the same customers he previously solicited at Micro-Probe, such as Intel, the products are

15 aimed at different markets.  FormFactor cannot establish through this testimony that

16 Browne improperly "used" its trade secrets.

17    In a similar vein, FormFactor asserts that Browne was hired by Micro-Probe so that

18 he could use the knowledge he obtained from FormFactor, citing to the deposition

19 testimony of Micro-Probe's CEO, Michael D. Slessor, Ph.D.  In the cited testimony, Dr.

20 Slessor was asked whether it was true that eight particular Micro-Probe employees,

21 including Browne, were hired "because, in part, they worked at FormFactor."  Dr. Slessor

22 responded that they were hired "[b]ecause, in part, they had probe card experience . . .

23 which certainly came when they were at FormFactor."  This testimony does not support a

24 claim that Browne was hired to work at Micro-Probe because of his knowledge of

25 FormFactor's trade secrets – let alone that Browne "used" those trade secrets at

26 FormFactor.

27    Finally, with regard to the theory espoused by FormFactor's expert Dr. Annette

28 Ermshar, a clinical psychologist – that from "a neurological and physiological standpoint,

18

United States District Court

For the Northern District of California

1   Mr. Browne cannot do anything but use [FormFactor's] information given the similarity of

2   his job at [Micro-Probe] with his job at [FormFactor] and the length of time" – the court finds

3   that testimony regarding Browne's memory and brain function is irrelevant to the issues in

4   the present case, and thus unreliable under Federal Rule of Evidence 702.

5          Moreover, in arguing that Browne must have used the FormFactor trade secrets at

6   Micro-Probe because his job duties at the two companies were "the same," FormFactor

7   appears to be seeking to insert the "inevitable disclosure" doctrine into its motion without

8   actually naming it.  Under the doctrine of "inevitable disclosure," a plaintiff may prove a

9   claim of trade secret misappropriation by demonstrating that a defendant's new

10  employment will inevitably lead him to rely on the plaintiff's trade secrets.  FLIR Sys., Inc. v.

11  Parrish, 174 Cal. App. 4th 1270, 1277 (2009); Whyte v. Schlage Lock Co., 101 Cal. App.

12  4th 1443, 1458-64 (2002).  However, California does not recognize the doctrine of

13  inevitable disclosure.  See FLIR, 174 Cal. App. 4th at 1279.

14         As for the statements in Micro-Probe-created documents that FormFactor was

15  "standing in the way" of Micro-Probe's success, and had to be "displaced," and that Micro-

16  Probe's goal was to "learn as much as we can" about FormFactor and to "[a]lways win

17  Intel," the court finds that at most, such statements simply reflect the fact that these two

18  companies are competitors, and as such, have an interest in increasing their market share,

19  in hiring the best candidates, and in wanting to learn as much as possible about the

20  competition.  Absent some concrete evidence of actual unlawful use of FormFactor's trade

21  secrets, none of these statements has any bearing on the resolution of the case.

22                    c.      Causation and damages

23         The final requirement to establish misappropriation of trade secrets is to show that

24  the alleged misappropriation caused damage to the plaintiff.  Silvaco Data Sys. v. Intel

25  Corp., 184 Cal. App. 4th 210, 220 (2010), disapproved on other grounds by Kwikset Corp.

26  v. Superior Court, 51 Cal. 4th 310 (2011); see also Science of Skincare, LLC v.

27  Phytoceuticals, Inc., 2009 WL 2050042 at *5 (C.D. Cal. July 7, 2009).

28         FormFactor's position, as stated at the hearing, is that it need not show causation

United States District Court
For the Northern District of California

1  and damage in order to obtain summary judgment as to liability. However, causation is

2  plainly an element of the cause of action, and even if FormFactor had managed to establish

3  the existence of trade secrets and improper disclosure or use, it could not prevail in the

4  absence of a showing that it was harmed by defendants' use or disclosure of particular

5  trade secrets.  In this case, FormFactor having failed to adequately identify any trade

6  secrets or to demonstrate misappropriation, no causal link to any alleged harm can be

7  drawn.

8        FormFactor's corporate designee Ben Eldridge testified that because Micro-Probe is

9  now the supplier to Intel, FormFactor has lost $40 million a year.  Nevertheless, the

10 evidence shows that FormFactor's business with Intel began to slow three years before any

11 of the facts underlying the trade secret claim had occurred.  Moreover, Mr. Eldridge

12 provided no concrete evidence connecting the alleged misappropriation to the loss of Intel

13 business.  Rather, he simply stated that it must have been Browne's going to Micro-Probe

14 that caused the loss of business, "because of the experience he brought with him when he

15 went over there."  He added, "I believe [Browne's] presence there [Micro-Probe] along with

16 the other individuals that were hired, were crucial in convincing them [Intel] to continue to

17 pursue Micro-Probe and – ultimately drop work with FormFactor's product."

18        2.        Breach of confidence and unfair business practices

19        FormFactor contends that summary judgment is appropriate as to the cause of

20 action for breach of confidence and conspiracy to breach confidence, and as to the cause

21 of action for unfair business practices.  Defendants assert that the claims for breach of

22 confidence and unfair business practices are preempted by the CUTSA, because they are

23 based on the same nucleus of operative facts as the trade secret misappropriation claim.

24 Defendants also contend that these two causes of action fail on the merits.

25        The legislative purpose behind the enactment of the CUTSA was to formulate a

26 consistent sent of rules to govern and define liability for conduct falling within its terms.

27 See Cal. Civ. Code § 3426.8; Silvaco, 184 Cal. App. 4th at 239 n.22.  Section 3426.7

28 describes the effect of the CUTSA on other statutes or remedies, providing that "[t]his title

United States District Court

For the Northern District of California

1   does not affect (1) contractual remedies, whether or not based upon misappropriation of a

2   trade secret, (2) other civil remedies that are not based on misappropriation of a trade

3   secret, or (3) criminal remedies, whether or not based upon the misappropriation of a trade

4   secret."  Cal. Civ. Code § 3426.7(b).

5         California courts have held that this "savings clause" supersedes common law

6   claims that are based on "the same nucleus of facts as the misappropriation of trade

7   secrets claim for relief," and that there is no basis for allowing common law claims to go

8   forward simply because "they seek 'something more' than trade secret relief.'" See K.C.

9   Multimedia, Inc. v. Bank of America Tech. & Operations, Inc., 171 Cal. App. 4th 939, 957-

10  58 & n.7 (2009); see also Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd., 2007 WL

11  801886 at *6 (N.D. Cal. Mar. 14, 2007).

12        That is, the CUTSA "provides the exclusive civil remedy for conduct falling within its

13  terms, so as to supersede other civil remedies 'based upon misappropriation of a trade

14  secret.'" Silvaco, 184 Cal. App. 4th at 236; see also K.C. Multimedia, 171 Cal. App. 4th at

15  954 (the language of § 3426.7 "implicitly preempts alternative civil remedies based on trade

16  secret misappropriation"); id. at 957-59 & n.7 (a claim cannot simply depend on a "different

17  theory of liability" to survive the CUTSA's preemptive effect).

18        There has been some dispute among courts with regard to whether the CUTSA's

19  savings clause applies only to claims that allege misappropriation of trade secrets, or

20  whether it also applies to other common law claims alleging misappropriation of confidential

21  information that does not enjoy trade secret protection.  See, e.g., Bryant v. Mattel, Inc.,

22  2010 WL 3705668 at *21-22 (C.D. Cal. Aug. 2, 2010) (and cases cited therein).  However,

23  the California Court of Appeal in Silvaco concluded that any common law claim premised

24  on the wrongful taking of information that does not qualify as a trade secret is also

25  superseded, unless the plaintiff can identify some law that confers property rights protecting

26  the information.  Id., 184 Cal. App. 4th at 236-40; see also Mattel, Inc. v. MGA Entm't, Inc.,

27  782 F.Supp. 2d 911, 985-87 (C.D. Cal. 2011) ("CUTSA supersedes claims based on the

28  misappropriation of confidential information, whether or not that information meets the

United States District Court<br>For the Northern District of California

1   statutory definition of a trade secret").[3]

2        Here, FormFactor asserts that both the breach of confidence claim and the unfair

3   competition claim are based on acts that Micro-Probe took to build a business that

4   competes unfairly with FormFactor's business, on Browne's having violated his duty to

5   maintain as confidential those items that do not qualify for trade secret protection, and on

6   Micro-Probe's having conspired with him to do so.  According to FormFactor, these claims

7   apply to any confidential information on the List that does not qualify for trade secret

8   protection (although FormFactor does not specify the nature of the alleged confidential

9   information).

10        FormFactor also argues that these two claims are not preempted by the CUTSA

11   because the CUTSA preemption applies only to claims that are based on misappropriation

12   of trade secrets, whereas in this case, the breach of confidence claim is based on misuse

13   of FormFactor's confidential information that is not a trade secret, and the unfair

14   competition claim is based on Micro-Probe's improper inducement of FormFactor

15   employees to breach their obligations regardless of whether those employees stole trade

16   secrets.

17        Nevertheless, with regard to the breach of confidence claim, FormFactor's position

18   has consistently been that there is no distinction between the alleged trade secret

19   information and the alleged confidential information.  For example, FormFactor's corporate

20   designee Ben Eldridge testified that FormFactor's "trade secret" information and its

21   "confidential" information are the same, and asserted that "[s]ince I consider our

22   confidential information to be trade secret, there would be no separate harm."

23        With regard to the unfair competition claim, FormFactor argues that in hiring Browne

24   for information he could provide, and in hiring other FormFactor employees, Micro-Probe

25   was able to acquire instant access to FormFactor's technology – information that would

26   have taken it a considerable amount of time to develop on its own.  FormFactor contends

27   _____

28        [3] Although some courts use the word "preempt," the court in Silvaco indicated that the proper term is "supersede" or "displace."  Id., 184 Cal. App. 4th at 232 n.14.

United States District Court
For the Northern District of California

1    that these actions violate § 17200, because they significantly harm or threaten competition.

2    The court finds that both claims are based on the same nucleus of operative facts as

3    the trade secret misappropriation claim.  With regard to the breach of confidence claim,

4    CUTSA preempts other claims based on misappropriation of confidential information,

5    regardless of whether the information ultimately meets the statutory definition of a trade

6    secret.  See Mattel, 782 F.Supp. 2d at 987-89; see also K.C. Multimedia, 171 Cal. App. 4th

7    at 960.

8    The crux of the unfair competition claim, based on the allegation that Micro-Probe

9    "hire[d] as many [FormFactor] employees as it could in order to obtain access to

10   [FormFactor] engineering, technical, financial, and marketing information," is that Micro-

11   Probe used FormFactor's human resources to develop and/or exploit FormFactor's trade

12   secrets or confidential information.  Thus, the unfair competition claim is inseparable from

13   the nucleus of facts underlying its trade secret claim as pled, which means it is superseded

14   by the CUTSA.  See K.C. Multimedia, 171 Cal. App. 4th at 961-62.

15   As a separate basis for finding that defendants' motion must be granted as to the

16   unfair competition claim, the court finds that any claim that Micro-Probe "poached"

17   FormFactor's employees fails.  Under Business & Professions § 16600, California public

18   policy supports employee mobility, with the goal of ensuring that California employers will

19   be able to compete effectively for the most talented and skilled employees in their

20   industries.[4]  And in any event, there is no evidence of any agreement between FormFactor

21   and Browne or FormFactor and Micro-Probe that would give rise to any contractual

22   obligation for Micro-Probe to refrain from hiring former FormFactor employees.

23

24   _____

     [4]  The general rule in California is that covenants not to compete are void.  See City of

25   Oakland v. Hassey, 163 Cal. App. 4th 1477, 1491 (2008) (citing Cal. Bus. & Prof. Code
     § 16600).  However, broad covenants not to compete are not void if they are necessary to

26   protect trade secrets.  Comedy Club, Inc. v. Improv West Assocs., 553 F.3d 1277, 1290 (9th
     Cir. 2009) (citing Whyte, 101 Cal. App. 4th at 1443).  In their opposition argument, defendants

27   acknowledge that California courts recognize an exception to § 16600 relating to trade secrets
     or proprietary information, but argue that to the extent that FormFactor is attempting to invoke

28   that exception, that would bring the unfair competition claim within the ambit of CUTSA
     preemption.

United States District Court

For the Northern District of California

1   Finally, with regard to the conspiracy allegations, civil conspiracy is not a separate

2   and distinct cause of action under California law.  Entertainment Res. Group, Inc. v.

3   Genesis Creative Group, Inc., 122 F.3d 1211, 1228 (9th Cir. 1997).  Rather, it is "a legal

4   doctrine that imposes liability on persons who, although not actually committing a tort

5   themselves, share with the immediate tortfeasors a common plan or design in its

6   perpetration."  Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11

7   (1994).

8   To establish a conspiracy, the plaintiff must show the "formation and operation of the

9   conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the

10   common design."  Mox, Inc. v. Woods, 202 Cal. 675, 677 (1927).  However, in the absence

11   of a viable underlying claim, FormFactor cannot establish a conspiracy.  See Applied

12   Equip., 7 Cal. 4th at 511 (conspiracy "must be activated" by "commission of an actual tort").

13                                   **CONCLUSION**

14   In accordance with the foregoing, FormFactor's motion for summary judgment is

15   DENIED, and defendants' motion for summary judgment is GRANTED.  As the court did

16   not rely on any inadmissible evidence, the evidentiary objections are OVERRULED.

17   With regard to Phase 2 of this case, the court has scheduled a patent technology

18   tutorial for October 12, 2012, to begin at 9:00 a.m.

19

20   **IT IS SO ORDERED.**

21   Dated: June 7, 2012

22                                   _____

23                                   PHYLLIS J. HAMILTON
                                     United States District Judge

24

25

26

27

28